The complainant sues in behalf of himself and the concerns of the Unitas Fratrum in this State. It is set forth that
The U. F. are acknowledged as an ancient Protestant Episcopal Church; *Page 363 
Have no joint stock or funds;
Have negotiated loans by their agents, for the purpose of making new establishments or settlements, and in particular for the purchase and settlement of Wachovia. The lenders had their option either to come to this country, and receive lands to the value of their respective loans, or remain in Europe, and be reimbursed from the sale of the lands.
That the lands of the U. F. were conveyed to complainant, by deed of lease and release, by their secretary, James Hatton; and that he was afterwards authorized to sell and transact the business of the U. F. by act of the General Assembly, which confirmed the deeds so made.
That he is empowered by the U. F. to institute suits, etc.
That Henry Cossart, known agent of the U. F. and admitted such by act of Parliament, obtained two grants of land from Earl Granville to him, as agent for the U. F., the one for 3,840 acres, more or less; the second for 4,933 acres, more or less, both in Wilkes County; that these lands were granted and conveyed in trust, and that the grantee held the same in trust as a trustee for the U. F.
That before the 4th of July, 1776, Henry Cossart died, leaving Christian Frederick Cossart residing in the Kingdom of Ireland, his heir-at-law, who continued to reside in that kingdom, and never came to America, and was never admitted a citizen of this or any of the United States.
That Ch. Frederick Cossart, in the year 1772, after the death of his father, the original grantee, executed a letter of attorney empowering the complainant to sell the said lands, with power of substitution; in pursuance of which he, on the 4th of October, 1774, substituted John Michael Graff to execute the said power in his stead.
That John Michael Graff, in pursuance of the said substitution, (440) on the 23d of July, 1778, sold to Hugh Montgomery, for a valuable consideration, and conveyed as well the legal estate, which was supposed to be vested in Cossart, as the equitable interest of the Unitas Fratrum in the said lands.
That Graff received £ 1,000 in part of the purchase money; and to secure the payment of the balance, £ 1,500, took a lease on the whole lands for five hundred years, to be void on the payment of that balance with interest.
That Graff soon after died intestate, and administration of his estate was committed to Traugott Bagge, who in December, 1784, assigned the lease to the complainant in trust for the U. F.
That in the year 1778 Hugh Montgomery entered upon and took possession of the premises, and that his trustee and executors have from *Page 364 
that time continued in possession of some part of it, but never have paid up any part of the balance of £ 1,500, or the interest.
That the General Assembly have validated and confirmed the power of attorney, under which the lands were sold to Montgomery.
Demurrer 1st. That U. F. are not parties, etc.
It appears by the bill that the complainant F. W. Marshall holds in trust for the U. F.; it is therefore necessary, in order to entitle the complainant to a decree, that the cestuis que trustent, whoever they may be, should be made parties; though it is said it is not always necessary to make the trustee a party. Kirk v. Clark, Cha. prec., 275; Vin. Abr., Title Party, p. 250, fol. ed. It is said that the U. F. are known and acknowledged a religious society by act of Parliament before the revolution, and recognized as such by our acts of Assembly since, which have confirmed their titles to certain tracts of land within this State; that they are very numerous, and it would be extremely inconvenient, if not altogether impracticable, to set forth the individual name of every member of the society; yet certain individuals by name might sue, in behalf of themselves and the rest of the society, in conjunction with the trustee; as in the case of the treasurer and managers of the Temple Brass (441) Works Company. 2 Cases in Equity Abridged, 168.
2d. Though it appears plainly, from the facts set forth in the bill, that the U. F. have an interest in the lands, they are not in Court to claim it. It is true F. W. Marshall says he is empowered to prosecute suits for them; but he is only their agent or attorney, and cannot maintain a suit in his own name. It does not appear to me that it is necessary to make the money lenders parties other than such as came over to this country and received lands in satisfaction for their loans. The presumption, however, as was well observed by one of the counsel for the complainants, is, that after so great a length of time the money has been paid, or the lenders satisfied in some other way; if not, they may have their remedy against the borrowers, but have no lien on the lands, as it appears the money was intended for other purposes as well as to purchase lands, and none of them have any claim on the lands except such of them as may come to this country with a view to settle on them. Therefore it was not necessary to make the lenders of the money parties, or any of the U. F. but such as are acknowledged citizens of this State, who alone have any pretense to claim an interest in it.
3d. It was not necessary that Cossart should enter — he had no right to the possession, having only a naked trust, for the use and benefit of the U. F., who were the only persons who had the sole right of occupation and possession under the Stat. of 27 Hen. VIII. *Page 365 
4th. It appears that the lands in question were granted by Earl Granville to Henry Cossart, in trust, for the use of the U. F. and for no other use or purpose whatsoever; that he died sometime in the year . . . and that the trust descended to his son, C. F. Cossart, who, before the Declaration of Independence executed a letter of attorney to F. W. Marshall to sell and dispose of the lands, who substituted J. M. Graff for that purpose, and who, in the year after the declaration of rights, sold, etc. It is therefore contended that C. F. Cossart, at the time of forming the constitution and bill of rights, being an alien, his estate evolved on the people of the State, in their (442) collective capacity, who took the estate discharged of the trust.
It would be useless to look into books for a case in every respect similar to the one now in question. The case which comes nearest to it is where the trustee died, leaving an alien his heir-at-law; in that case it is contended the lands would escheat to the lord, discharged of the trust. And there are some cases to warrant this opinion, though the case of Ealesv. England, reported in Precedents in Chancery, states the law to be otherwise, that the lord would hold as trustee for the benefit of thecestui que trust.
All the cases that are to be met with in the books, however, differ from this, that the trusts were created, and conveyed by a tenant who held under a superior lord, who was entitled to the escheat free from any trust, to the use of the grantee only. In this case Earl Granville, who was entitled to the escheat, created the trust himself, and granted the estate in trust to the first grantee. Therefore, if the grantee had died, leaving an alien his heir, and for that cause the estate had escheated to Earl Granville, I am clearly of opinion that he would have taken it charged with the trust, as he could not, on any principle either of law or equity, be allowed to avoid his own deed, so as to destroy a trust created by himself bona fide, and for a valuable consideration.
It is next to be considered in what manner this trust was effected, by the revolution and change of government by which Earl Granville's interest in his estate in this country became vested in the collective body of the people, when they assumed the sovereignty of the State. By the 25th section of the Declaration of Rights, after describing the limits of the State, it is declared that all the territories within those limits "are the right and property of the people of this State, to be held by them in sovereignty." 1st proviso, saving to the Indians their rights to hunting grounds.2d proviso, reserving a right to establish one or more governments to the westward.3d proviso, "That nothing herein contained shall affect the titles or possessions of individuals holding or claiming under the laws heretofore in force, or grants (443) *Page 366 
heretofore made by the late King George III, or his predecessors, or the late lords proprietors, or any of them." This proviso should on all occasions receive a liberal construction in favor of the rights of individuals to guard them against the encroachments of the public functionaries then established, and who by this instrument were vested with certain limited powers, from which the titles and possessions of individuals are expressly excepted. This Congress, which represented all the free inhabitants of this State, clothed with all their authority, and invested with all their rights, restrained by no law, unawed by any authority, in the plenitude of their power, have drawn a line between the proper rights in landed property of the individual citizen, and those of the collective body of the people. All titles or possessions, held or claimed under former laws or grants, either royal or proprietary, are secured and confirmed to the individual, so that he cannot be divested of them, but on a trial in due course of law. And this is a fundamental principle, which cannot be departed from by any power existing under the Constitution, without a direct and manifest violation of that sacred compact, to which it is the duty of every citizen to adhere and defend from every attack, however respectable the authority may be from whence it may originate. It has been contended by the counsel for the complainant, that by this proviso the right of C. F. Cossart is saved; but this position cannot be supported from a rational or grammatical construction of that clause. The declaratory part in the first instance vests the whole in the collective body of the people; the proviso then reserves certain rights to individuals, which can only mean individuals of the collective body of the people of this State, or of the people who were then represented in that Congress. C. F. Cossart never was one of the people of this State, nor was he one of the people represented in that Congress; he therefore cannot avail himself of any benefit or advantage from the saving in that proviso. But though it does not extend to the confirmation of Cossart's right, yet it fully comprehends (444) the rights of the U. F., who were then inhabitants of the State, and individuals of the collective body of the people, who held a rightful possession under a bona fide purchase, for a valuable consideration, and a grant from one of the late lord proprietors; not only an actual but a legal possession, under the Act of the 27th H. VIII, ch. 10, for transferring uses into possessions, which vests the possession in him of them that have the use. Thus the possession of these lands are irrevocably vested in the U. F. by the Constitution.
It has been said by the counsel for the defendants, that the Acts of Assembly, commonly called the confiscation laws, have vested the use of all lands held by persons who were not resident in this State, or some *Page 367 
one of the United States, at the time of the Declaration of Independence, and have not since been admitted as citizens of the State. Should that be the case, it can have no effect on the interest of the U. F., which is secured to them by the Constitution, which must be admitted to be paramount to an act of the Legislature, which is itself a creature of the Constitution. These acts, however, in other respects, may well stand without interfering with the Constitution; but when duly considered, will be found to vest no right to the lands of aliens in the State, other than it had under the Constitution. The confiscation acts had in view three other objects, on all of which they might operate with propriety: 1st. To direct in what manner the estates of aliens should be sold and disposed of. 2d. To confiscate and forfeit the lands of traitors, and of such citizens of this State, or of any of the United States, who had gone over to the enemy, on conviction.3d. To restore to aliens their estates, on their taking the oaths to government and becoming citizens.
The lands of aliens being already vested in the State, any further act could add nothing to the validity of the right of the State; but it was necessary to point out the mode of disposing and conveying these lands. In every other respect, these acts, so far as they relate to aliens, operate as acts of grace and favor, holding forth to them the generous offer of restoring their estate on their becoming citizens. And when the Legislature discovered so plainly a disposition to be not only (445) just but generous, in regard to aliens, it ought not to be presumed that they meant to deprive their own citizens of rights, which they held under the solemn sanction of the Constitution. As the land was secured to the U. F. by the Constitution, if I am right in my position, it is unnecessary to say anything of the inquest of office relied on by the counsel.
In regard to the conveyance made to Montgomery, it is evident that Cossart, at the time of making the conveyance by his attorney, had no interest in the estate, and of course his attorney could convey nothing. But it is charged in the complainant's bill that this defect is remedied by an act of the General Assembly; so far, however, as that conveyance affects the interest of the U. F., if made by their consent, and under their authority, it is sufficient to convey their interest and to vest the use and possession of the premises in the purchaser, his heirs and assigns; and they, in return, are bound to fulfill their engagements with the U. F. Thus far I have considered the estate or interest which the collective body of the citizens of this State acquired in the lands heretofore vested in the King of Great Britain and his subjects, in the same light in which it was stated by counsel on both sides, namely, that it *Page 368 
was acquired by escheat. But it appears to me, on such consideration as I have been able to bestow on the subject, after looking into such authorities, both ancient and modern, as I could procure, that the acquisition of property obtained by the State at the revolution was not an escheat, as defined by any elementary writers on the laws of England — none of these have omitted it, and all of them correspond with the definition given by Blackstone, vol. 2, p. 244. I shall therefore only cite that respectable authority in his own words: "Escheat, we may remember, was one of the fruits and consequences of feudal tenure; the word itself is originally French or Norman, in which language it signifies chance or accident, and with us denotes an obstruction of the course of descent, and a consequent determination of the tenure by some (446) unforeseen contingency, in which case the estate naturally results back, by a kind of reversion, to the original grantor, or lord of the fee." Every person knows in what manner the citizens acquired the property of the soil within the limits of this State. Being dissatisfied with the measures of the British Government, they revolted from it, assumed the government into their own hands, seized and took possession of all the estates of the King of Great Britain and his subjects, appropriated them to their own use, and defended their possessions against the claims of Great Britain, during a long and bloody war, and finally obtained a relinquishment of those claims by the treaty of Paris. But this State had no title to the territory prior to the title of the King of Great Britain and his subjects, nor did it ever claim as lord paramount to them. This State was not the original grantor to them, nor did they ever hold by any kind of tenure under the State, or owe it any allegiance or other duties to which an escheat is annexed. How then can it be said that the lands in this case naturally result back by a kind of reversion to this State, to a source from whence it never issued, and from tenants who never held under it? Might it not be stated with equal propriety that this country escheated to the King of Great Britain from the Aborigines, when he drove them off, and took and maintained possession of their country?
At the time of the revolution, and before the Declaration of Independence, the collective body of the people had neither right to nor possession of the territory of this State; it is true some individuals had a right to, and were in possession of certain portions of it, which they held under grants from the King of Great Britain; but they did not hold, nor did any of his subjects hold, under the collective body of the people, who had no power to grant any part of it. After the Declaration of Independence and the establishment of the Constitution, the people may be said first to have taken possession of this country, at *Page 369 
least so much of it as was not previously appropriated to individuals. Then their sovereignty commenced, and with it a right to all the property not previously vested in individual citizens, with all (447) the other rights of sovereignty, and among those the right of escheats. This sovereignty did not accrue to them by escheat, but by conquest, from the King of Great Britain and his subjects; but they acquired nothing by that means from the citizens of the State — each individual had, under this view of the case, a right to retain his private property, independent of the reservation in the declaration of rights; but if there could be any doubt on that head, it is clearly explained and obviated by the proviso in that instrument. Therefore, whether the State took by right of conquest or escheat, all the interest which the U. F. had previous to the Declaration of Independence still remained with them, on every principle of law and equity, because they are purchasers for a valuable consideration, and being in possession as cestui que trust under the statute for transferring uses into possession; and citizens of this State, at the time of the Declaration of Independence, and at the time of making the declaration of rights, their interest is secured to them beyond the reach of any Act of Assembly; neither can it be affected by any principle arising from the doctrine of escheats, supposing, what I do not admit, that the State took by escheat.
On consideration of this case, I am of opinion that the bill is insufficient for want of proper parties, as set forth in the demurrer, and ought to be dismissed, unless the Court permit the parties to amend, by adding the proper parties. That the other causes of demurrer are not material, and ought to be overruled.
On the motion of the complainant to amend, I am of opinion that as there has not yet been any judgment on the demurrer, that on application to the Court of Morgan District, they be permitted to amend, by inserting proper parties in their bill, on paying the costs of the bill and demurrer, and one attorney's fee. (See Mitford on Pleading, E. III, 146-147.)